Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

United States Courts
Southern District of Texas
FILED

*August 06, 2025*

Nathan Ochsner, Clerk of Court

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | **CRIMINAL NO. 4:25-cr-00415** |
| **v.** | § | |
| | § | |
| **RAMON ALEXANDRO ROVIROSA** | § | |
| **MARTINEZ,** | § | |
| **MARIO ALBERTO AVILA** | § | |
| **LIZARRAGA** | § | |

### INDICTMENT

THE GRAND JURY CHARGES:

At all times relevant to this Indictment, unless otherwise stated:

### The Foreign Corrupt Practices Act

1.      The Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1, *et seq.*, was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

### Relevant Individuals and Entities

2.      Defendant **RAMON ALEXANDRO ROVIROSA MARTINEZ** ("**ROVIROSA**") was a citizen of Mexico and, since in or around March 2016, a United States lawful permanent resident and a resident of Texas. **ROVIROSA** was a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(h)(l).

3.      Defendant **MARIO ALBERTO AVILA LIZARRAGA** ("**AVILA**") was a citizen of Mexico and, since in or around November 2016, a United States lawful permanent resident and a resident of Texas. **AVILA** was a "domestic concern" and an "agent" of a "domestic concern,"

1

as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(a) and 78dd-2(h)(l).

4.     Petróleos Mexicanos ("PEMEX") was the state-owned oil company of Mexico. PEMEX and its wholly owned subsidiaries were wholly owned and controlled by the government of Mexico and performed functions that Mexico treated as its own.  PEMEX, together with its subsidiaries and affiliates, was responsible for the exploration, production, refining, transportation, and trade in energy resources in Mexico.  PEMEX Exploración y Producción ("PEP") was PEMEX's wholly owned exploration and production subsidiary.  PEMEX and PEP were "instrumentalities" of a foreign government, and officers and employees of PEMEX and PEP were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

5.     Mexico Energy Company #1, Mexico Energy Company #2, Mexico Energy Company #3, Mexico Energy Company #4, Mexico Energy Company #5, and Mexico Energy Company #6 (collectively, "the Mexico Energy Companies"), entities whose identities are known to the Grand Jury, were Mexican companies that operated in the oil and gas industry.  The Mexico Energy Companies were owned, controlled, or otherwise associated with **ROVIROSA**.  **AVILA** worked for the benefit of **ROVIROSA** and the Mexico Energy Companies.

6.     Co-Conspirator #1, an individual whose identity is known to the Grand Jury, was a citizen of Mexico.  Co-Conspirator #1 was an assistant to **AVILA** in Mexico.

7.     Co-Conspirator #2, an individual whose identity is known to the Grand Jury, was a citizen of Mexico.  Co-Conspirator #2 was **ROVIROSA**'s relative and worked on behalf of companies associated with **ROVIROSA**, including the Mexico Energy Companies.

8.      Co-Conspirator #3, an individual whose identity is known to the Grand Jury, was a citizen of Mexico.  Co-Conspirator #3 was **ROVIROSA**'s relative and was employed by Mexico Energy Company #2, among other companies.

9.      Foreign Official #1, an individual whose identity is known to the Grand Jury, was a citizen of Mexico.  Foreign Official #1 was employed by PEMEX as a senior internal audit manager assigned to PEP.  Foreign Official #1 acted in an official capacity for and on behalf of PEMEX and PEP and was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

10.     Foreign Official #2, an individual whose identity is known to the Grand Jury, was a citizen of Mexico.  Foreign Official #2 was employed by PEMEX as a procurement coordinator. Foreign Official #2 acted in an official capacity for and on behalf of PEMEX and was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

11.     Foreign Official #3, an individual whose identity is known to the Grand Jury, was a citizen of Mexico.  Foreign Official #3 was employed by PEMEX and PEP within a division responsible for management of services relating to land infrastructure.  Foreign Official #3 acted in an official capacity for and on behalf of PEMEX and PEP and was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

## The Bribery Scheme

12.     Beginning at least in or around June 2019 and continuing through at least in or around October 2021, **ROVIROSA** and **AVILA**, together with others known and unknown to the Grand Jury, engaged in a bribery scheme in which they offered, paid, promised to pay, and authorized the payment of, bribes in the form of cash payments, luxury items, and other things of value, to and for the benefit of foreign officials in Mexico, including Foreign Official #1, Foreign Official #2, and Foreign Official #3, in exchange for those foreign officials taking certain actions,

using their influence within PEMEX and PEP to affect and influence the acts and decisions of PEMEX and PEP, and providing improper advantages, in order for **ROVIROSA** and **AVILA** to obtain and retain business from PEMEX and PEP for certain of the Mexico Energy Companies, in violation of the FCPA.

13.    **ROVIROSA**'s and **AVILA**'s conduct resulted in Foreign Official #1, Foreign Official #2, and Foreign Official #3 taking actions that included, but were not limited to:

a.    <u>Bribes for Audit Closure and Payment from PEMEX and PEP</u>: Directing other PEMEX and PEP employees, including at least one of Foreign Official #1's subordinates in PEMEX's internal audit function, to resolve an audit relating to three of the Mexico Energy Companies in a manner favorable to those companies, a resolution which **ROVIROSA** and **AVILA** understood would also remove audit-related restrictions on the companies' abilities to receive payments from PEMEX and PEP and obtain additional business with PEMEX and PEP;

b.    <u>Bribes for Roads and Platforms Contract</u>: Ensuring that certain of the Mexico Energy Companies were awarded a contract with PEMEX and PEP regarding roads and platforms work (the "Roads and Platforms Contract"), including by ending a then-ongoing audit of Mexico Energy Company #1 and Mexico Energy Company #2 that had generated adverse findings; and

c.    <u>Bribes for Mechanical Integrity Contract</u>: Ensuring that certain of the Mexico Energy Companies were awarded a contract with PEMEX and PEP regarding mechanical integrity of ground installations (the "Mechanical Integrity Contract"), including by ignoring an erroneous technical report submitted by those Mexico Energy Companies in connection with the bidding process and by intervening in the bidding process for the benefit of the Mexico Energy Companies.

14.    These improper advantages resulting from the bribery scheme helped certain of the Mexico Energy Companies obtain and retain business with PEMEX and PEP.  Specifically, in or around 2020, certain of the Mexico Energy Companies and their partners were awarded PEMEX/PEP contracts worth a combined value of at least USD $2.5 million.

15.    In total, between at least in or around June 2019 and at least in or around October 2021, **ROVIROSA** and **AVILA**, together with others, offered, paid, caused to be paid, promised

to pay, and authorized the payment and provision of, bribes totaling at least USD $150,000 in value for the benefit of Foreign Official #1, Foreign Official #2, and Foreign Official #3.

*Bribes for Audit Closure and Payment from PEMEX and PEP*

*Overview*

16.      From in or around June 2019 through in or around November 2019, **ROVIROSA** and **AVILA** offered, promised, paid, and authorized bribes in the form of cash payments and luxury items, including a Louis Vuitton handbag and a Hublot watch, to Foreign Official #1 in exchange for Foreign Official #1 taking actions to favorably resolve an audit of certain of the Mexico Energy Companies and to secure authorization for payment from PEMEX and PEP to certain of the Mexico Energy Companies.  During approximately the same time, **ROVIROSA** and **AVILA** also offered, promised, paid, and authorized bribes in the form of cash payments to Foreign Official #3 in exchange for Foreign Official #3 taking actions to authorize payment from PEMEX and PEP to certain of the Mexico Energy Companies.

*Details of the Scheme*

17.      In or around 2013, Mexico Energy Company #2, Mexico Energy Company #3, and Mexico Energy Company #4 entered into a contract with PEP for work related to pipeline maintenance that would extend through 2018 ("Pipeline Maintenance Contract").  Several years later, in or around early 2019, PEMEX's internal audit function within PEP began an audit of the Pipeline Maintenance Contract.  **ROVIROSA** and **AVILA** understood that, during the pendency of the audit, Mexico Energy Company #2, Mexico Energy Company #3, and Mexico Energy Company #4 would not receive payments from PEMEX and PEP under the Pipeline Maintenance Contract.

18.      In or around June and July 2019, **AVILA**, at **ROVIROSA**'s direction, messaged Foreign Official #1 on WhatsApp regarding Foreign Official #1's supervision of the audit and

5

requested that Foreign Official #1 use his influence to resolve the audit favorably for the Mexico Energy Companies and to ensure payment from PEMEX and PEP in exchange for bribes.

19.     In or around June 2019, **AVILA** promised Foreign Official #1 via WhatsApp a Louis Vuitton luxury handbag for Foreign Official #1 to give to his wife as a gift in exchange for Foreign Official #1's actions to influence the audit and ensure payment to the Mexico Energy Companies.

20.     In or around July 2019, **ROVIROSA** and **AVILA** became aware of two potential results for the audit: one requiring the Mexico Energy Companies to return approximately MXP $1 million to PEMEX and PEP, and the other requiring the Mexico Energy Companies to return approximately MXP $225,000 to PEMEX and PEP.  In exchange for Foreign Official #1 exercising his influence over the audit to ensure that the Mexico Energy Companies owed only approximately MXP $225,000 instead of MXP $1 million, on or about July 9, 2019, **AVILA** promised Foreign Official #1 a Hublot luxury watch worth approximately USD $12,500, writing via WhatsApp, as translated into English, "A Hublot as a commission haha."

21.     On or about July 24, 2019, Foreign Official #1 sent **AVILA** the final result of the audit via WhatsApp, stating, as translated into English, "Mission accomplished!!!"  The final result of the audit required the Mexico Energy Companies to repay approximately MXP $225,000 instead of MXP $1 million.  Foreign Official #1 stated to **AVILA** via a WhatsApp voice message, as translated into English, that "instead of the collection being a million, it was only two hundred thousand pesos . . . and now they agreed to make the payment for the twenty kilos," referring to a prospective payment of MXP $20 million from PEMEX/PEP to Mexico Energy Company #2, Mexico Energy Company #3, and Mexico Energy Company #4.  Foreign Official #1 wrote, as translated into English, that he "deserve[d] a gift . . . [w]hat we agreed on" for the assistance he provided to **AVILA** and **ROVIROSA**.  Foreign Official #1 wrote to **AVILA** via WhatsApp, as

translated into English, "We fulfilled the commitment!!!!" and "Now Alex [**ROVIROSA**] just has to do his part!!!"

22.     On or about July 24, 2019, **AVILA** responded to Foreign Official #1 indicating that **AVILA** had spoken with **ROVIROSA** and that **AVILA** and **ROVIROSA** would pay Foreign Official #1 as soon as they received payment from PEMEX and PEP relating to the Pipeline Maintenance Contract.

23.     On or about October 15, 2019, Foreign Official #1 informed **AVILA** via WhatsApp that, according to conversations Foreign Official #1 had with others at PEMEX and PEP, the Mexico Energy Companies could resume submitting invoices to PEMEX and PEP for payment.

24.     On or about October 15, 2019, **AVILA** responded that he would inform **ROVIROSA**.

25.     On or about October 18, 2019, Foreign Official #1 messaged **AVILA** on WhatsApp, confirming receipt of the Louis Vuitton luxury handbag and thanking **AVILA**.

26.     On or about October 18, 2019, **AVILA** responded to Foreign Official #1's messages thanking **AVILA** for the Louis Vuitton luxury handbag, writing, as translated into English, "You're welcome, bud; you've earned it."

27.     **ROVIROSA**, **AVILA**, and their co-conspirators also paid cash bribes in the amount of approximately MXP $2.5 million to Foreign Official #3, of which Foreign Official #1 received a portion, in order to induce Foreign Official #3 and Foreign Official #1 to assist the Mexico Energy Companies in securing authorizations for payment from PEMEX and PEP under the Pipeline Maintenance Contract.  In or around November 2019, **ROVIROSA** and Co-Conspirator #3 arranged for an individual to deliver a cash payment in Mexico to Foreign Official #3, who then arranged for part of the cash payment to be given to Foreign Official #1.  On or about November 27, 2019, Co-Conspirator #2 sent an email with transfer receipts to Co-

Conspirator #3, documenting payments arranged by **ROVIROSA** that Co-Conspirator #3 arranged to have withdrawn in cash and delivered to Foreign Official #3.

<u>*Bribes for Roads and Platforms Contract*</u>

*Overview*

28.    In or around 2019, Mexico Energy Company #1 and Mexico Energy Company #2 bid on the Roads and Platforms Contract.  Prior to the bid decision, in or around early 2020, **ROVIROSA** and **AVILA** asked Foreign Official #1 to ensure that Mexico Energy Company #1 and Mexico Energy Company #2 won the bid and were awarded the Roads and Platforms Contract. Foreign Official #1 used his influence at PEMEX and PEP to help Mexico Energy Company #1 and Mexico Energy Company #2 win the contract, including by closing an audit related to those companies and working with other PEMEX/PEP officials, including Foreign Official #2, to ensure that Mexico Energy Company #1 and Mexico Energy Company #2 won the Roads and Platforms Contract.  In exchange for Foreign Official #1's and Foreign Official #2's assistance, **ROVIROSA** and **AVILA** provided approximately MXP $220,000 in cash to Foreign Official #1 and promised to make bribe payments to Foreign Official #2.

*Details of the Scheme*

29.    In or around January 2020, **AVILA** complained to Foreign Official #1 via WhatsApp that **ROVIROSA** was not receiving any new PEMEX/PEP contracts due to ongoing audits of contracts involving certain of the Mexico Energy Companies.  Foreign Official #1 responded by saying that **AVILA** should reassure **ROVIROSA** that Foreign Official #1 would resolve the audits.  On or about January 23, 2020, Foreign Official #1 sent **AVILA** a WhatsApp message, writing, as translated into English, "tell Alex [**ROVIROSA**] that I'm looking into it," and, "I've ordered that that finding from the audit be resolved as soon as possible" so that others at PEMEX/PEP "no longer have the audit as a pretext for not giving them work."

8

30.     In or around January and February 2020, Foreign Official #1 took additional actions to ensure Mexico Energy Company #1 and Mexico Energy Company #2 were awarded the Roads and Platforms Contract, including pressuring PEMEX/PEP officials, including Foreign Official # 2, regarding the technical evaluation of the companies' bids.

31.     On or about February 20, 2020, Foreign Official #1 sent **AVILA** a voice message on WhatsApp discussing a meeting between Foreign Official #1 and Foreign Official #2 regarding the forthcoming award of the Roads and Platforms Contract, and Foreign Official #1 indicated to **AVILA** that the decision awarding the contract would be published on or about February 28, 2020. In the voice message, Foreign Official #1 also told **AVILA** that Foreign Official #2 had asked Foreign Official #1 to remind **AVILA** that **AVILA** had to, as translated into English, "fulfill the deal to [Foreign Official #2]."

32.     On or about February 22, 2020, Foreign Official #1 and **AVILA** agreed via WhatsApp on the amount that **AVILA** and **ROVIROSA** would pay Foreign Official #2 for his help with the Roads and Platforms Contract.  **AVILA** wrote to Foreign Official #1, as translated into English, "You tell me how we should divvy it up . . . But yes I'll give [Foreign Official #2] ten for sure."

33.     On or about February 28, 2020, Foreign Official #1 sent **AVILA** a WhatsApp message attaching a copy of an official PEMEX document awarding Mexico Energy Company #1 and Mexico Energy Company #2 the Roads and Platforms Contract, with a value between approximately MXP $12 million and approximately MXP $30 million.  In that message to **AVILA**, Foreign Official #1 wrote, as translated into English, "Mission accomplished, Bro!!!" and asked **AVILA** to speak with **ROVIROSA** about providing Foreign Official #1 and Foreign Official #2 the promised payment in exchange for their assistance.

34.     In or around early March 2020, **ROVIROSA** and **AVILA** arranged for **AVILA**'s assistant in Mexico, Co-Conspirator #1, to deliver cash payments to Foreign Official #1 in Mexico. Specifically, on or about March 3, 2020, **AVILA** asked Co-Conspirator #1 via WhatsApp for her bank account information, which Co-Conspirator #1 provided to **AVILA**.

35.     Thereafter, on or about March 3, 2020, **ROVIROSA** instructed Co-Conspirator #2 via WhatsApp to make two transfers of approximately MXP $600,000 each to bank accounts in the names of (i) Individual #1 (**AVILA**'s relative) and (ii) Co-Conspirator #1.  On or about March 3, 2020, Co-Conspirator #2 transferred the funds as directed by **ROVIROSA** from a bank account in the name of Mexico Energy Company #6.  On or about March 4, 2020, **AVILA** instructed Individual #1 via WhatsApp to transfer the funds that Individual #1 received into Co-Conspirator #1's bank account, and Individual #1 did so.

36.     On or about March 5, 2020, Foreign Official #1 traveled to Campeche, Mexico, to pick up the first part of the cash payment from Co-Conspirator #1.

37.     On or about March 6, 2020, Co-Conspirator #1 withdrew cash from Co-Conspirator #1's bank account and traveled from Campeche, Mexico, to Ciudad del Carmen, Mexico, where Co-Conspirator #1 delivered the second part of the cash payment to Foreign Official #1, in the amount of approximately MXP $220,000.

38.     On or about March 11, 2020, PEMEX/PEP, Mexico Energy Company #1, and Mexico Energy Company #2 signed the Roads and Platforms Contract.

*Bribes for Mechanical Integrity Contract*

*Overview*

39.     In or around 2019, Mexico Energy Company #1 and Mexico Energy Company #5 submitted a bid for the Mechanical Integrity Contract.  In exchange for the promise of bribes from **AVILA** and **ROVIROSA**, Foreign Official #1 intervened in the bidding and selection process to

ensure that Mexico Energy Company #1 and Mexico Energy Company #5 were awarded the Mechanical Integrity Contract.  Consistent with their promise of bribes, **AVILA** and **ROVIROSA** provided a treadmill to Foreign Official #1.

*Details of the Scheme*

40.     On or about August 9, 2019, **AVILA** sent Foreign Official #1 a WhatsApp message attaching a bid document for the Mechanical Integrity Contract and informed Foreign Official #1 that **ROVIROSA** would be submitting a bid.  In response, Foreign Official #1 asked **AVILA**, as translated into English, "How can I help you with this?"  **AVILA** responded, as translated into English, "Have them give it to him."

41.     On or about August 29, 2019, **AVILA** sent Foreign Official #1 a WhatsApp message, writing, as translated into English, "[T]hey're going to deliver the proposals [for the Mechanical Integrity Contract], remember that if it's given there, we're going too."  Foreign Official #1 responded, as translated into English, "I'm looking into it.  But I need to start seeing some love already . . . ."

42.     On or about October 31, 2019, during a WhatsApp conversation between Foreign Official #1 and **AVILA** discussing Hublot luxury watches, **AVILA** messaged Foreign Official #1, as translated into English, "Get the bid from Alex [**ROVIROSA**] that I told you about and we'll buy 2 [Hublot watches]."

43.     On or about March 6, 2020, **AVILA** messaged Foreign Official #1 via WhatsApp, writing, as translated into English, "Man, I'm really counting on you to not drop the ball on the other issue [the Mechanical Integrity Contract], this one's a sure thing, and we'll get another prize. If the technical part goes as planned, we might not even need to split it with [Foreign Official #2]."

44.     On or about March 7, 2020, Foreign Official #1 informed **AVILA** via WhatsApp that he had asked Foreign Official #2 for support regarding the Mechanical Integrity Contract, and

11

that Foreign Official #1 and a colleague in PEMEX's internal audit function had, as translated into English, "already gotten in the process." **AVILA** responded, as translated into English, "Perfect."

45.     On or about March 17, 2020, in response to a question from **AVILA** regarding the status of **ROVIROSA**'s bid on the Mechanical Integrity Contract, Foreign Official #1 responded to **AVILA** via WhatsApp with excerpts of results from PEMEX/PEP's technical evaluation process, showing that Mexico Energy Company #1 and Mexico Energy Company #5 were deemed non-compliant with certain bid requirements.

46.     On or about March 23, 2020, Foreign Official #1 messaged **AVILA** via WhatsApp and informed **AVILA** that Mexico Energy Company #1 and Mexico Energy Company #5 should be permitted to move forward with the bid, and that, as translated into English, "[t]his time the intervention of Foreign Official #2's team was crucial, so that Alex [**ROVIROSA**] really values it, please!"  In that message, Foreign Official #1 informed **AVILA** that, on the following day, Foreign Official #1 would participate in a meeting with representatives from the procurement and technical functions at PEMEX/PEP and that Foreign Official #1 would advocate on behalf of Mexico Energy Company #1 and Mexico Energy Company #5.

47.     On or about March 24, 2020, Foreign Official #1 participated in a meeting with Foreign Official #2 and others regarding the technical evaluation of proposals for the Mechanical Integrity Contract.  Following the meeting, Foreign Official #1 sent **AVILA** a message via WhatsApp about the meeting, stating, as translated into English, "Mission accomplished, Bro!!!" and stating that Foreign Official #1 was "a damn bullfighter" and had "entered the ring!!" Consistent with Foreign Official #1's messages, Mexico Energy Company #1 and Mexico Energy Company #5 were listed among the four potentially compliant bidders after that meeting.

12

48.    On or about April 3, 2020, Foreign Official #1 informed **AVILA** via WhatsApp that the final decision awarding the Mechanical Integrity Contract would be made on April 21, 2020, and that, as translated into English, they would be "opening up the champagne" on April 21.

49.    On or about April 16, 2020, Foreign Official #1 informed **AVILA** via WhatsApp that the bid submitted by Mexico Energy Company #1 and Mexico Energy Company #5 was deemed to comply with the technical requirements of the Mechanical Integrity Contract.

50.    On or about April 21, 2020, PEMEX and PEP awarded the Mechanical Integrity Contract to Mexico Energy Company #1 and Mexico Energy Company #5, for an approximate value of MXP $52 million.

51.    On or about April 22, 2020, Foreign Official #1 messaged **AVILA** via WhatsApp regarding the award, and **AVILA** informed Foreign Official #1 that **AVILA** would let **ROVIROSA** know about the award so that **ROVIROSA** could, as translated into English, "schedule the support." Foreign Official #1 responded to **AVILA**, as translated into English, "And in addition to the decision, we'll continue with the support during the execution, with not auditing it, with agreements, and everything else that can be done!"

52.    On or about April 22, 2020, in exchange for Foreign Official #1's assistance, **AVILA** purchased and arranged for the delivery of a treadmill costing approximately MXP $26,000 to Foreign Official #1.

*Request for Additional Improper Assistance in October 2021*

53.    In furtherance of the above bribery scheme, in or around October 2021, **AVILA** contacted Foreign Official #1 to request his interference with a bid that a company affiliated with **ROVIROSA** submitted for a PEMEX contract.

54.    On or about October 6, 2021, **AVILA** messaged Foreign Official #1 via WhatsApp, writing, as translated into English, "Hi brother . . . When you have a chance call me."

13

55.     Immediately thereafter, also on or about October 6, 2021, **AVILA** sent Foreign Official #1 a series of screenshots and other documents via WhatsApp.  The documents appeared to relate to a bid that a company affiliated with **ROVIROSA** submitted for a PEMEX contract.

56.     On or about October 6, 2021, **AVILA** messaged Foreign Official #1 via WhatsApp, writing, as translated into English, "They're asking him to decide by tomorrow, and whoever accepts is going to crash because the cost is nearly 60 million [USD]," and "It's impossible that they want him to go down to 25 million [USD]."

57.     On or about October 6, 2021, Foreign Official #1 responded to **AVILA** via WhatsApp, writing, as translated into English, "I already saw it . . . I have no influence whatsoever in that area . . . It's impossible and I can't do absolutely anything . . . I hope you understand."

58.     On or about October 6, 2021, **AVILA** responded to Foreign Official #1 via WhatsApp, writing, as translated into English, "The one who's looking at this is beneath [Foreign Official #2], that is, he reports to him."

## COUNT ONE
### (Conspiracy – 18 U.S.C. § 371)

59.     Paragraphs 1 through 58 are realleged and incorporated by reference as though fully set forth herein.

60.     Beginning in or around June 2019 and continuing through at least in or around October 2021, in the Southern District of Texas and elsewhere, the defendants,

**RAMON ALEXANDRO ROVIROSA MARTINEZ**
**and**
**MARIO ALBERTO AVILA LIZARRAGA,**

together with Co-Conspirator #1, Co-Conspirator #2, Co-Conspirator #3, and others known and unknown to the Grand Jury, did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly conspire, confederate, and agree together and with each other to

14

commit one or more offenses against the United States, namely: being a domestic concern and an agent of a domestic concern, to make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist **ROVIROSA** and **AVILA** in obtaining and retaining business for and with, and directing business to, **ROVIROSA**, the Mexico Energy Companies, and others, in violation of Title 15, United States Code, Section 78dd-2.

<u>**Purpose of the Conspiracy**</u>

61.    It was a purpose of the conspiracy for **ROVIROSA**, **AVILA**, and their co-conspirators to offer, promise to pay, and pay bribes to foreign officials, including Foreign Official #1, Foreign Official #2, and Foreign Official #3, in order to obtain and retain business with PEMEX and PEP, for and with, and direct business to, the Mexico Energy Companies, and to secure improper advantages for the Mexico Energy Companies in connection with their business with PEMEX and PEP.

**Manner and Means of the Conspiracy**

62.     The manner and means by which **ROVIROSA**, **AVILA**, and their co-conspirators sought to accomplish, and did accomplish, the purpose of the conspiracy included, but were not limited to, the following:

a.      It was part of the conspiracy that **ROVIROSA**, **AVILA**, and their co-conspirators communicated with and through others regarding offers, promises to pay, and payments of bribes to Foreign Official #1, Foreign Official #2, and Foreign Official #3, in exchange for improper advantages and other actions.

b.      It was further part of the conspiracy that **ROVIROSA**, **AVILA**, and their co-conspirators used cash deliveries in Mexico to make bribe payments, in part to conceal those payments.

c.      It was further part of the conspiracy that **AVILA** promised Foreign Official #1 luxury gifts in exchange for Foreign Official #1 and others conferring improper advantages and taking actions to benefit and direct business to the Mexico Energy Companies.

d.      It was further part of the conspiracy that **ROVIROSA**, **AVILA,** and their co-conspirators took steps to conceal both (i) their agreement to pay bribes to foreign officials—including Foreign Official #1, Foreign Official #2, and Foreign Official #3—and (ii) their payments of bribes to these foreign officials, including by using encrypted messaging platforms and transferring corrupt payments via cash and goods.

**Overt Acts**

63.     In furtherance of the conspiracy and to achieve the objects thereof, **ROVIROSA**, **AVILA**, and at least one of the co-conspirators committed and caused to be committed, in the Southern District of Texas and elsewhere, at least one of the following overt acts, among others:

a.      On or about June 13, 2019, **AVILA** sent a WhatsApp text message to Foreign Official #1, writing, as translated into English, "Great, once they pay, we'll figure out how to split up the candy."

b.      On or about July 9, 2019, **AVILA** sent a WhatsApp text message to Foreign Official #1, writing, as translated into English, "A Hublot as a commission haha."

c.      On or about July 17, 2019, while **AVILA** was in the Southern District of Texas, in response to a message from Foreign Official #1 containing a photograph of a Hublot luxury watch priced at approximately USD $12,500, **AVILA** sent a

16

WhatsApp text message to Foreign Official #1, writing, as translated into English, "I'm ordering it now."

d.      On or about July 24, 2019, **AVILA** sent a WhatsApp voice message to Foreign Official #1, stating, as translated into English, "I talked to the friend [**ROVIROSA**]. As soon . . . as they pay him . . . we'll coordinate things . . . to go and greet you, okay?"

e.      On or about August 9, 2019, **AVILA** sent a WhatsApp text message to Foreign Official #1, containing a screenshot of a request for proposals from PEMEX/PEP and, referencing the contract to be awarded, asked Foreign Official #1, as translated into English, "Have them give it to him [**ROVIROSA**]."

f.      On or about October 18, 2019, in response to a message from Foreign Official #1 thanking **AVILA** for sending Foreign Official #1 a Louis Vuitton luxury handbag, **AVILA** sent a WhatsApp text message to Foreign Official #1, writing, as translated into English, "You're welcome, bud; you've earned it."

g.      On or about October 23, 2019, after Foreign Official #1 sent a WhatsApp text message to **AVILA**, informing him, as translated into English, that "[t]hey confirmed to me that Alex [**ROVIROSA**]'s invoices entered for payment in 20 days" and "I'll keep an eye out for your instructions regarding them," **AVILA** replied, as translated into English, "Yes man I'm speaking with him [**ROVIROSA**] today, I think the payment can now move forward." Also on or about October 23, 2019, Foreign Official #1 responded to **AVILA's** text message, writing, as translated into English, "Alright. And you let me know the mechanics."

h.      On or about October 31, 2019, in response to messages from Foreign Official #1 regarding a Hublot luxury watch, **AVILA** sent a WhatsApp text message to Foreign Official #1, writing, as translated into English, "Get the bid from Alex [**ROVIROSA**] that I told you about and we'll buy 2 [Hublot watches]."

i.      On or about November 6, 2019, **ROVIROSA** sent a WhatsApp text message to Co-Conspirator #3 concerning the disbursement of cash bribes, writing, as translated into English, "I'll give them [Foreign Official #1 and Foreign Official #3] 3 and they should bear with me for the rest."

j.      On or about November 8, 2019, **ROVIROSA** sent a WhatsApp text message to Co-Conspirator #3, writing, as translated into English, "Well you just go to the bank closest to the tower and give [MXP $500,000] at a time," and "When you go to give him the money, ask to speak to [Foreign Official #3], say that if possible I want to speak to him directly pls . . . I want him to be clear about everything that has been done . . . And that I ended up paying too much so they see the goodwill and that I won't hesitate to ask for favors from above again."

k.      On or about November 27, 2019, **AVILA** sent a WhatsApp text message to Foreign Official #1, writing, as translated into English, "they gave it to him

yesterday, what was outstanding, and they're going to take it to you personally on Friday, Foreign Official #3."

l.    On or about March 3, 2020, **ROVIROSA** sent a WhatsApp text message to Co-Conspirator #2, writing, as translated into English, "I need to deposit [MXP $600,000] to each account for the earthworks contract they just gave us."

m.    On or about March 5, 2020, while **AVILA** was in the Southern District of Texas, **AVILA** sent a WhatsApp text message to Foreign Official #1, writing, as translated into English, "The package just landed in Campeche."

n.    On or about March 6, 2020, while **AVILA** was in the Southern District of Texas, **AVILA** sent a WhatsApp text message to Foreign Official #1, writing, as translated into English, "[Co-Conspirator #1]'s on her way to the bank to withdraw the rest."

o.    On or about March 6, 2020, while **AVILA** was in the Southern District of Texas, **AVILA** sent a WhatsApp text message to Foreign Official #1, writing, as translated into English, "Man, I'm really counting on you to not drop the ball on the other issue, this one's a sure thing, and we'll get another prize.  If the technical part goes as planned, we might not even need to split it with [Foreign Official #2]."

p.    On or about March 6, 2020, while **AVILA** was in the Southern District of Texas, **AVILA** sent a WhatsApp text message to Foreign Official #1, writing, as translated into English, "[Co-Conspirator #1] will get to your house at 3pm, you've got her cell number, call her if anything comes up."  Also on or about March 6, 2020, Foreign Official #1 responded to **AVILA**, writing, as translated into English, "Awesome."

q.    On or about April 22, 2020, while **AVILA** was in the Southern District of Texas, in response to a message from Foreign Official #1 that included a screenshot showing that Mexico Energy Company #1 and Mexico Energy Company #5 had been awarded the Mechanical Integrity Contract, **AVILA** sent a WhatsApp text message to Foreign Official #1, writing, as translated into English, "Very good man, now I'll let him [**ROVIROSA**] know to schedule the support."

r.    On or about April 22, 2020, while **AVILA** was in the Southern District of Texas, **AVILA** sent a WhatsApp text message to Foreign Official #1, writing, as translated into English, "It's done bro," referring to **AVILA** completing the order of a treadmill from Costco for Foreign Official #1.

s.    On or about October 6, 2021, while **AVILA** was in the Southern District of Texas, **AVILA** sent several WhatsApp text messages to Foreign Official #1, attaching a series of documents relating to a PEMEX contract for which a company affiliated with **ROVIROSA** was bidding.  **AVILA** also wrote, as translated into English, "They're asking him to decide by tomorrow, and whoever accepts is going to crash

18

because the cost is nearly 60 million [USD]," and "The one who's looking at this is beneath [Foreign Official #2], that is, he reports to him."

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH FOUR
### (Foreign Corrupt Practices Act – 15 U.S.C. § 78dd-2; 18 U.S.C. § 2)

64.    Paragraphs 1 through 58 and 61 through 63 are realleged and incorporated by reference as though fully set forth herein.

65.    On or about the dates set forth below, within the Southern District of Texas and elsewhere, the defendants,

### RAMON ALEXANDRO ROVIROSA MARTINEZ
### and
### MARIO ALBERTO AVILA LIZARRAGA,

being a domestic concern and an agent of a domestic concern, and by aiding and abetting a domestic concern, did willfully and corruptly make use of, and aid, abet, counsel, command, induce, procure, and willfully cause others to make use and cause to be used, the mails and means and instrumentalities of interstate commerce in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to a person while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist **ROVIROSA** and **AVILA** in obtaining and

retaining business for and with, and directing business to, **ROVIROSA**, the Mexico Energy

Companies, and others, as follows:

| COUNT | APPROXIMATE DATE | MEANS AND INSTRUMENTALITIES OF INTERSTATE COMMERCE |
|-------|------------------|----------------------------------------------------|
| Two | November 8, 2019 | WhatsApp message from **ROVIROSA** to Co-Conspirator #3 to coordinate the delivery of a cash bribe to Foreign Official #3, stating, as translated into English, "The money is there the 2.5 million pesos." |
| Three | March 5, 2020 | WhatsApp message from **AVILA** to Foreign Official #1 informing Foreign Official #1 that a cash payment for Foreign Official #1's benefit (referred to by **AVILA** as "the package," as translated into English) had arrived in Campeche, Mexico, for Foreign Official #1 to pick up. |
| Four | March 6, 2020 | WhatsApp message from **AVILA** to Foreign Official #1 confirming that Co-Conspirator #1 would arrive at Foreign Official #1's home later that day to deliver an additional cash payment. |

All in violation of Title 15, United States Code, Section 78dd-2 and Title 18, United States

Code, Section 2.

## NOTICE OF CRIMINAL FORFEITURE

66.     Pursuant to Title 18, United States Code, Section 981(a)(l)(C) and Title 28, United

States Code, Section 2461(c), the United States hereby gives notice to the defendants that in the

event of conviction of any of the offenses charged in Counts One through Four, the government

will seek forfeiture of all property, real or personal, constituting or derived from proceeds traceable

to such offenses.

67.    The United States will seek the imposition of a money judgment against each defendant.  In the event that a condition listed in Title 21, United States Code, Section 853(p) exists, the United States may seek to forfeit any other property of the defendants in substitution.


A TRUE BILL


*Original Signature on File*
FOREPERSON OF THE GRAND JURY


NICHOLAS J. GANJEI                     LORINDA I. LARYEA
UNITED STATES ATTORNEY                 ACTING CHIEF, FRAUD SECTION
SOUTHERN DISTRICT OF                   CRIMINAL DIVISION
TEXAS                                  U.S. DEPT. OF JUSTICE


BY: *Brad Gray*                        BY: *Lindsey D. Carson*
BRAD GRAY                              LINDSEY D. CARSON
ASSISTANT U.S. ATTORNEY                ABDUS SAMAD PARDESI
                                       PAUL G. REAM
                                       TRIAL ATTORNEYS